UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

JEREMY DEWAYNE BROWN,

                    Petitioner,                          Case No. 1:17-cv-418

v.                                                       Honorable Robert J. Jonker

SHANE JACKSON,

                    Respondent.
_____/

## REPORT AND RECOMMENDATION

        This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Jeremy Dewayne Brown is incarcerated with the Michigan Department of Corrections at the Carson City Correctional Facility (DRF) in Carson City, Michigan.  Following a jury trial in the Wayne County Circuit Court, Petitioner was convicted of two counts of first-degree murder, Mich. Comp. Laws § 750.316, and two counts of torture, Mich. Comp. Laws § 750.85.   On December 21, 2012, the court sentenced Petitioner to respective prison terms of life for the murder convictions and 20 to 50 years for the torture convictions.

        Petitioner was also charged with two counts of unlawful imprisonment and two counts of felony murder.  The trial court granted a directed verdict in Petitioner's favor with regard to the unlawful imprisonment counts (Trial Tr. Dec. 3, 2012, ECF No. 9-24, PageID.3213.)  The jury found Petitioner guilty of two counts of felony murder.  (Trial Tr. Dec. 10, 2012, ECF No. 28, PageID.3691-3692.)   Initially, judgment was entered against Petitioner on four counts of murder.  (Wayne Cty. Cir. Ct. Register of Actions, ECF No. 9-1, PageID.80-81.)  The Michigan Court of Appeals, however, remanded to permit the trial court to correct Petitioner's judgment of

sentence "to show a single conviction of first-degree murder for both [victims,] Conaway and Brown, each supported by two different theories.  (Mich. Ct. App. Op., ECF No. 9-30, PageID.3747.)

On May 4, 2017, Petitioner filed his habeas corpus petition raising three grounds for relief, as follows:

I.    WHERE THE EVIDENCE DID NOT PROVE BEYOND A REASONABLE DOUBT THAT APPELLANT KNEW OF HIS CO-DEFENDANT'S PLAN UNTIL AFTER IT HAD ALREADY TAKEN PLACE, IT WAS LEGALLY INSUFFICIENT TO PROVE THAT HE AIDED AND ABETTED THEM AND THUS INSUFFICIENT TO SUSTAIN HIS CONVICTIONS.

II.    THE TRIAL COURT VIOLATED APPELLANT'S DUE PROCESS RIGHTS BY DISPARAGING COUNSEL'S DECISION NOT TO EXERCISE A CHALLENGE FOR CAUSE.

III.    THE TRIAL COURT REVERSIBLY ERRED AND DENIED APPELLANT HIS DUE PROCESS RIGHTS TO A FAIR TRIAL IN ADMITTING CELL PHONE RECORDS WHERE THE PROSECUTION COULD NOT LAY A SUFFICIENT FOUNDATION TO PROVE APPELLANT'S CONNECTION TO THE PHONE.

(Pet., ECF No. 1, PageID.15.)  Respondent has filed an answer to the petition (ECF No. 8) stating that the grounds should be denied because they are meritless.  Upon review and applying the standards of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA), I find that the grounds are without merit.  Accordingly, I recommend that the petition be denied.

## Discussion

I.    <u>Factual allegations</u>

Petitioner was one of four defendants tried together for the February 28, 2012, abduction, torture, and murder of 18-year-old Abreeya Brown and her best friend, 21-year-old Ashley Conaway.  Weeks before Abreeya and Ashley were murdered, they had been present during

a separate shooting incident involving Petitioner's co-defendants Brandon Cain and Brian Lee. The women refused to discontinue their participation in the prosecution of that crime.  The prosecutor in Petitioner's case contended that Cain and Lee used middle-man Miguel Rodriguez to secure the services of Petitioner and Reginald Brown to help Cain and Lee silence the women. (Trial Tr. Oct. 30, 2012, ECF No. 9-11, PageID.842.)  The Michigan Court of Appeals provided a concise summary of the crime:

> [Ashley] Brown and Conaway were abducted on the evening of February 28, 2012. They were placed in the trunk of a vehicle and, for a short while, were able to use their cell phones to communicate with friends and family members from their location in the trunk, but they were not seen or heard from afterward.  On March 24, 2012, the police found the victim's bodies buried in shallow graves in Eliza Howell Park.  Autopsies revealed that each victim had been shot in the head at close range.

(Mich. Ct. App. Op., ECF No. 9-30, PageID.3723) (footnotes omitted).

The five defendants were scheduled to be tried together.  (*Id*., PageID.3733.) Rodriguez, after the jury for Cain/Lee was empaneled, instead entered a plea of guilty to two counts of second-degree murder; he also agreed to testify truthfully on behalf of the prosecution.  (*Id*.) The trial continued against the other four defendants—one jury for Cain and Lee and a second jury for Petitioner and Reginald Brown.  During opening arguments, the prosecutor informed the jury they would get certain information regarding the crime and that it would come from Rodriguez. (Trial Tr. Oct. 30, 2012, ECF No. 9-11, PageID.843-846.)   At an interview conducted in preparation for Rodriguez's testimony, Rodriguez indicated to the prosecutor that his testimony might be different than the information he offered at his plea hearing.  (Trial Tr. Nov. 28, 2012, ECF No. 9-22, PageID.2954-2980.)  The prosecutor, fearing that Rodriguez intended to perjure himself, decided not to call him.  (*Id*.)  When the defendants indicated they wanted to call him, Rodriguez's counsel informed them that Rodriguez would assert his Fifth Amendment rights. (Trial Tr. Dec. 5, 2012, PageID.3329.)  None of the other Defendants testified.

3

The prosecution called four individuals who were eyewitnesses to some portion of the criminal acts that occurred that night.  The testimony of each of these witnesses—Major Chapman (Trial Tr. Oct 30, 2012, ECF No. 9-11, PageID.873-984), Tristan Cash (Trial Tr. Oct. 31, 2012, ECF No. 9-12, PageID.995-1221; Trial Tr. Nov. 2, 2012, PageID.1233-1264.), Andre Douglas (Trial Tr. Nov. 8, 2012, ECF No. 9-16, PageID.1639-1881), and Jasmine Richbow (Trial Tr. Nov. 13, 2012, ECF No. 9-18, PageID.1947-2138; Trial Tr. Nov. 14, 2012, ECF No. 9-19, PageID.2161-2188)—is summarized below.

Abreeya and Ashley were abducted near the home where they lived with Abreeya's stepfather, Major Chapman, at 2228 Andrus Street in Hamtramck, Michigan.  Chapman testified that he responded that night to someone repeatedly pressing his doorbell.  When he opened the door, he saw Cain in the street with a gun and another person he did not recognize dragging Abreeya toward a car.  Cain shot at Chapman.  Chapman retrieved his own weapon from a first-floor bedroom and returned fire.  A firefight ensued.   Police later found spent shells from three handguns (including Chapman's) and holes in the house that they expected came from shotgun pellets.  Chapman ducked back into the house to avoid the fusillade.

When Chapman looked out again, Cain and the car with his stepdaughter had pulled away.  He called the police.  After the police arrived, he received a call on his home telephone from Abreeya.  She told him she was in the trunk, that Ashley was there as well, that she did not know where they were being taken, and she described the vehicle—then they were disconnected.

Although Cain, Lee, Petitioner, R. Brown, and Rodriguez were the main participants, there were other persons who, perhaps unwittingly, provided assistance that night.  Tristan Cash, for example, drove Rodriguez around.  He met Rodriguez at Rodriguez's mother's house on Hartwell Avenue in Detroit.  When Cash arrived, R. Brown was across the street in the

4

driveway of an abandoned house, holding a gun.  He was standing by a Chrysler Sebring.  Brown was there with a person Cash could not identify, presumably Lee, and eventually Cain arrived. Brown, Cain, the unidentified man, and Rodriguez stood by the open trunk of the Sebring, they talked, and then the group broke up.  Rodriguez told Cain to drive to another location, Rodriguez's Uncle Andre's (Andre Douglas's) house on Riverdale.

When Rodriguez and Cash arrived at Douglas's house, Uncle Andre, Cain, R. Brown, and the unidentified man were already there.  Rodriguez approached and spoke with the group, then he returned to the car where Cash had remained.  Rodriguez and Cash then made a trip to K-mart where Rodriguez bought what Cash testified looked like two sticks, four or five feet long.  They returned to the Riverdale home.  Cain, R. Brown and the unidentified man were still there.  Rodriguez gave them the "sticks"—the prosecutor called them shovels and Cash did not contest that—and then returned to the car.[1]  Rodriguez and Cash left for a few minutes to use a restroom.  When they returned, the vehicles and men had moved down the road to a less-populated area near the woods.

Rodriguez left the vehicle and joined the other men for a couple of minutes and then returned.  Cash and Rodriguez then went to a gas station.  Rodriguez bought a gas can and filled it with gas.  They then travelled to Rodriguez's aunt's house on Bramell Street.  The Chrysler Sebring was already there, still running.  Cash also noticed a Monte Carlo parked by the home, a vehicle that he had seen Petitioner driving before.  Petitioner was in the vehicle.  Petitioner was "doin' somethin' to somethin' with a dishwashin' liquid."  (Trial Tr. Oct. 31, 2012, ECF No. 9-12, PageID.1059.)

---

[1] Security video from K-mart showed Rodriguez purchasing two shovels that night.  (Trial Tr. Nov. 19, 2012, ECF No. 9-20, PageID.2463-2478.)  The K-mart representative testified that the shovel head that was recovered from the burnt Chrysler Sebring was the type of shovel sold at K-mart.  (*Id.*, PageID.2477-2478.)

Miguel went into the house with the gas can.  Rodriguez remained in the house longer than Cash expected.  Cash went inside.  There, R. Brown, clad only in his underwear, was arguing with Rodriguez.  Cash went back out to the car.  A couple of minutes later, Rodriguez came out as well, without the gas can.

Andre Douglas testified as well.  Andre testified that he was a friend of Cain and Lee, but he did not know Petitioner or R. Brown.  He reported that Cain had called him on February 28th and instructed him to bring to the house on Riverdale $4,000.00 Andre was holding for Cain. Andre arrived at the house and waited about twenty minutes before Cain and Lee arrived in one vehicle.  Two other vehicles arrived at about the same time.  Andre gave Cain the money.  Andre never saw who was in the other vehicles.  All of the vehicles then left.

Jasmine Richbow was in the house on Bramell the night of the kidnapping.  Around 1:30 a.m., Petitioner knocked on the window of the bedroom.  Richbow let him into the house. Petitioner indicated he was waiting for R. Brown.  After waiting for a time Petitioner told Richbow that R. Brown should have been at the Bramell house.  Eventually R. Brown arrived, covered in mud.  R. Brown told Petitioner to get rid of the bullets and clean a gun that R. Brown pulled from his pocket.

Petitioner left the room for a few minutes.  When he returned, he asked Richbow if she wanted a purse he was carrying.  There was a boot in the purse and a phone and some paper. Richbow later recognized the purse as belonging to her cousin, Abreeya.

Thereafter, R. Brown displayed a wad of money and said: "things a [racial slur] will do for money."  (Trial Tr. , ECF No. 9-18, PageID.1979.)  About ten minutes after that, Miguel Rodriguez arrived.  R. Brown told him to get some gas.  Rodriguez then left.  Miguel and R. Brown

6

discussed money.  R. Brown indicated that Miguel wanted $2,500.00.  R. Brown only wanted to give him $1,500.

R. Brown demanded and then donned Jeremy's pants.  Jeremy grabbed some shorts to wear that belonged to Richbow's boyfriend.  R. Brown's muddy clothes ended up in the kitchen garbage.  Eventually R. Brown left with the purse.  Jeremy left too.

The police found a burned-out Chrysler Sebring that morning, a block and a half away from the Bramell house.  Among the debris they found a fragment of Ashley's driver's license and a shovel head.  The head of the other shovel was found at the park where the girls were buried.

On March 24, Rodriguez led police to the Riverdale address.  The police found Ashley and Abreeya buried in a shallow, muddy grave in the woods across the street.  Each girl had been restrained and gagged by duct tape and shot once at close range in the side of the head.

In addition to the four key eyewitnesses, the jury also heard from: seven of the victim's family members and one boyfriend; a representative from K-Mart; the medical examiner; a fire investigator; and seventeen law enforcement witnesses who had participated in the investigation.  Among those witnesses, John Jaenig, from the United States Marshall Service, provided the most compelling testimony.  He compiled and analyzed the information from cell phone service providers that provided critical insights into the time and place of cell phone communications to and from the Defendants and to and from the victims.

The evidence implicating Cain, Lee, R. Brown, and Rodriguez was significant. Evidence implicating Jeremy Brown was less overwhelming.  No witness placed him at the scene on Andrus, on Hartwell, or on Riverdale.  Witness testimony references Petitioner for the first time after the fact at the house on Bramell.  If, however, one accepts that a particular cell phone belonged

to Petitioner and that he used it in the days immediately before, during, and after the kidnapping, there is evidence linking Petitioner to Andrus and Riverdale.

The jury deliberated for just a few hours before returning its verdicts.

Petitioner, with the assistance of appointed counsel, filed an application for leave to appeal raising his three habeas issues plus an issue regarding the impropriety of convicting Petitioner of felony murder and premeditated murder.  The court of appeals granted Petitioner relief as to that issue; however, as to the three issues raised here, the court denied relief in an opinion issued January 12, 2016.  (Mich. Ct. App. Op., ECF No. 9-30, PageID.3723-3747.)

Petitioner then filed a pro per application for leave to appeal in the Michigan Supreme Court raising the same three issues.  (Pet'r's Appl. for Leave to Appeal, ECF No. 9-31, PageID.3856-3876.)  The Michigan Supreme Court denied leave by order entered June 28, 2016. (Mich. Order, ECF No. 9-31, PageID.3855.)  Petitioner did not file a petition for certiorari in the United States Supreme Court.  (Pet., ECF No. 1, PageID.3.)  Instead, on May 4, 2017, he filed this petition.

## II.    AEDPA standard

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA).  The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision

that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."   28 U.S.C. § 2254(d).  This standard is "intentionally difficult to meet."  *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Williams*, 529 U.S. at 381-82; *Miller v. Straub*, 299 F.3d 570, 578-79 (6th Cir. 2002).  Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court.  *Greene v. Fisher*, 565 U.S. 34 (2011).  Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits.  *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts.  *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06).  "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 135 S. Ct. at 1376 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).  In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in

their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

III.    Sufficiency of the Evidence

The testimony from Chapman, Cash, and Douglas implicated Cain, Lee, R. Brown, and Rodriguez in the kidnapping and murders of Ashley and Abreeya, but that testimony did not suggest Petitioner's involvement. Thus, it is not surprising that Petitioner challenges the sufficiency of the evidence against him.

Although Cash could not identify one of the four participants that he observed, he knew it was not Petitioner. Jasmine Richbow's testimony revealed that Petitioner was no stranger to the "cleaning," presumably, of the murder weapon, or the disposal of the car or personal effects of the victims. That evidence, Petitioner argues, occurred after the torture and murder of the girls and, therefore, supports no greater criminal involvement than "accessory after the fact."

In Michigan, "accessory after the fact" is a common law offense: "an accessory after the fact is 'one who, with knowledge of the other's guilt, renders assistance to a felon in the effort to hinder his detection, arrest, trial or punishment.'" *People v. Perry*, 594 N.W.2d 477, 481 (Mich. 1999). It is a felony with a maximum sentence of five years. Mich. Comp. Laws § 750.505.

10

The only evidence that linked Petitioner to the crime before or during its occurrence was the testimony of John Jaehnig regarding cell phone communications.

The Michigan Court of Appeals measured the sufficiency of the evidence against Petitioner according to the following standard:

> A challenge to the sufficiency of the evidence in a jury trial is reviewed de novo, by reviewing the evidence in the light most favorable to the prosecution to determine whether the trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt. *People v Harverson*, 291 Mich App 171, 175; 804 NW2d 757 (2010). "All conflicts with regard to the evidence must be resolved in favor of the prosecution." *People v Wilkens*, 267 Mich App 728, 738; 705 NW2d 728 (2005).

(Mich. Ct. App. Op., ECF No. 9-30, PageID.3725.) Although the state appellate court cited state authority for the standard, that authority has its roots in the clearly established federal law of *Jackson v. Virginia*, 443 U.S. 307 (1979). *See People v. Wolfe*, 489 N.W. 2d 748, 750-51 (Mich. 1992).

A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson*, 443 U.S. at 319, which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* The habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

Because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the

11

Michigan Court of Appeals' consideration of the trier-of-fact's verdict, as dictated by AEDPA." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008).   This standard erects "'a nearly insurmountable hurdle'" for petitioners who seek habeas relief on sufficiency-of-the-evidence grounds.  *Davis v. Lafler*, 658 F.3d 525, 534 (6th Cir. 2008) (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

The Michigan Court of Appeals applied a standard identical to the *Jackson* standard and did so exactly as the Supreme Court directed: the court analyzed the evidence with specific reference to the elements of each charged offense.  In Petitioner's case the key inquiry did not center on his role as a principal, but on his role as an aider and abettor.  The appellate court identified the following elements necessary to convict a defendant under an aiding and abetting theory:

> (1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement.

(Mich. Ct. App. Op., ECF No. 9-30, PageID.3725) (citation omitted).  The court then reviewed the evidence:

> Contrary to J. Brown's argument that he was only an accessory after the fact, there was sufficient evidence for a reasonable trier of fact to conclude that he was an aider or abettor, if not a principal—helping before, during, and after the crimes. From  the exchange of text messages, between R. Brown and J. Brown on the day before the victims' kidnapping, the jury could infer that J. Brown was anticipating a windfall, which required planning and his assistance to acquire a gun and a car. The jury could also infer, from J. Brown's actions, that the windfall involved defendants' plan to torture and kill Conaway and Brown.  As discussed further below, the record demonstrated that J. Brown's phone number was \*\*\*-\*\*\*-9038, and his phone was used near the scene of the kidnapping—a place it had never been used previously—immediately before the kidnapping.  As the prosecutor argued, the jury could therefore infer that, from his presence, J. Brown aided the kidnapping by serving as a lookout.   Furthermore, the women were buried in Eliza Howell Park.  Given that J. Brown's phone was used near the park just hours before the crime, the prosecutor argued that the jury could infer that J. Brown was "scouting

out" that burial location ahead of time.  In addition to serving as a scout and a lookout, however, the jury could also infer that J. Brown offered aid and encouragement to defendants by meeting R. Brown after the shooting and burial, assisting with cleaning the weapon, setting fire to the silver Chrysler Sebring, which was used to transport the victims in the trunk, and providing a getaway to R. Brown as emergency personnel responded to the fire.  Finally, from text messages involving R. Brown, the jury could infer that J. Brown's motive with these crimes was the $10,000 that R. Brown was splitting with "J."  See *People v Henderson*, 306 Mich App 1, 11; 854 NW2d 234 (2014).

J. Brown claims on appeal that there is no evidence that he was the person using the phone at the scenes of the abduction and burial.  Again, as discussed further below, it was reasonable for the jury to infer that J. Brown was the person using that phone given who he was communicating with—his acquaintances and relatives (including his cousins, R. Brown and Miguel Rodriguez)—and witness testimony confirming that J. Brown was, in fact, in the places where and when the cell phone records show his phone was being used.  In any event, weighing the evidence, drawing reasonable inferences from the evidence, and making credibility determinations are tasks within the exclusive province of the jury and will not be second-guessed by this Court.  *Unger*, 278 Mich App at 232; *People v Gadomski*, 232 Mich App 24, 28; 592 NW2d 75 (1998).  The evidence was sufficient to establish J. Brown's guilt of the charged crimes.

(Mich. Ct. App. Op., ECF No. 9-30, PageID.3726-3727.)

The issues Petitioner raises in this Court are word-for-word identical to the issues he raised in the state appellate courts.  Petitioner has provided no briefing in this Court; therefore, the Court must rely on Petitioner's argument in his state court appellate briefs to discern the nature and scope of Petitioner's constitutional challenges.

The crux of Petitioner's sufficiency claim is that the text messages and phone records are too slender a reed to support the inference that Petitioner knew the other players intended to kidnap, torture, or murder anyone or to support the inference that he provided any assistance before or during the commission of the crimes.[2]  He does not dispute the existence of the evidence relied upon by the court of appeals; he disputes its significance.  Petitioner claims the

---

[2] Petitioner also challenges the admission of any evidence relating to the phone because the prosecutor failed to provide an adequate foundation to link the phone to Petitioner.  That argument is addressed in detail in § VI below.

phone evidence was not only circumstantial, but also too weak to permit an inference regarding what he knew or what he did.

The proofs against Petitioner were wholly circumstantial.  But, "'circumstantial evidence is entitled to the same weight as direct evidence.'"  *Bechtol v. Prelesnik*, 568 F. App'x 441, 450 (6th Cir. 2014) (quoting *United States v. Farley*, 2 F.3d 645, 650 (6th Cir. 1993)); *see also Desert Palace, Inc. v. Costa,* 539 U.S. 90, 100 (2003) ("[W]e have never questioned the sufficiency of circumstantial evidence in support of a criminal conviction, even though proof beyond a reasonable doubt is required."); *Morrow v. Tennessee*, 588 F. App'x 415, 421 (6th Cir. 2014) ("[E]ven though the State may not have shown direct evidence of intent, circumstantial evidence is enough."); *Britt v. Howes*, 404 F. App'x 954, 956-57 (6th Cir. 2010) ("'[C]ircumstantial evidence alone is sufficient to sustain a conviction . . . .'").  The phone records and text messages standing alone may not suffice; however, when they are considered along with the testimony of Chapman, Cash, Douglas, and Richbow, the phone records provide compelling corroboration to support the inferences necessary to find Petitioner guilty of aiding and abetting torture and murder.  As explained by the Michigan Court of Appeals, a jury could rationally infer from the circumstantial evidence that Petitioner knew that R. Brown, Cain, Lee, and Rodriguez were planning to execute Ashley and Abreeya and that Petitioner helped before, during, and after the crime.  That is the jury's province: "to draw reasonable inferences from basic facts to ultimate facts."  *Jackson*, 443 U.S. at 319.  The jury drew rational inferences from the evidence presented to find Petitioner guilty beyond a reasonable doubt of aiding and abetting first-degree murder and torture.

Petitioner has failed to show that the Michigan Court of Appeals determination that there was sufficient evidence to support his convictions is contrary to, or an unreasonable application of, *Jackson*.  Accordingly, he is not entitled to habeas relief.

IV.    The Trial Judge's Disparagement of Petitioner's Counsel

Petitioner claims the trial judge was biased against his counsel.  The bias Petitioner claims is evidenced in an exchange that occurred during jury *voir dire*.  At the close of the second day, a pair of jurors asked to be excused because the next day was a Muslim holiday.  The trial judge excused them.  One of the jurors left immediately, the other lingered.  The judge then asked if counsel had any objection.  Petitioner's counsel expressed some concern.  Before he could explain, the trial judge called back the jurors and told them they would have to come the next day despite the holiday because an attorney objected.  Petitioner contends the judge's indication that the jurors would have to come because an attorney objected cast his counsel in a bad light: as insensitive to the religious beliefs of Muslim jurors.  Petitioner contends the judge's actions and words demonstrate judicial bias.  Moreover, Petitioner claims that this bias may have influenced the jury to the detriment of his case and thereby violated his due process rights.

"Due process requires a fair trial before a judge without actual bias against the defendant or an interest in the outcome of his particular case."  *United States v. Armstrong*, 517 U.S. 456, 468 (1996); *see also In re Murchison*, 349 U.S. 133, 136 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process.  Fairness requires an absence of *actual* bias in the trial of cases.") (emphasis added)).  However, because of the difficulty in determining "whether a judge harbors an actual, subjective bias," the courts look to "whether, as an objective matter, the average judge in [that judge s] position is likely to be neutral, or whether there is an unconstitutional potential for bias."  *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1905 (2016)

(internal quotations omitted); *see also Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 883 (2009).  The Supreme Court has recognized constitutionally impermissible, objective indicia of bias in the following types of cases: (1) those cases in which the judge "has a direct, personal, substantial pecuniary interest in reaching a [particular] conclusion," *Tumey v. Ohio*, 273 U.S. 510, 523 (1997) (subsequently expanded to include even indirect pecuniary interest, *see Railey v. Webb*, 540 F.3d 393, 399-400 (6th Cir. 2008); (2) certain contempt cases, such as those in which the "judge becomes personally embroiled with the contemnor," *Murchison*, 349 U.S. at 141 (subsequently clarified to involve cases in which the judge suffers a severe personal insult or attack from the contemnor); and (3) cases in which a judge had prior involvement in the case as a prosecutor, *Williams*, 136 S. Ct. at 1905 (citing *Withrow v. Larkin*, 421 U.S. 35, 53 (1975).  The courts indulge "a presumption of honesty and integrity in those serving as adjudicators." *Withrow*, 421 U.S. at 47; *Coley v. Bagley*, 706 F.3d 741, 751 (6th Cir. 2013) (citing, *inter alia*, *Withrow*, 421 U.S. at 47).  "The presumption of impartiality stems not merely from the judicial-bias caselaw, [] but from the more generally applicable presumption that judges know the law and apply it in making their decisions, *see Lambrix v. Singletary*, 520 U.S. 518, 532 n. 4 (1997), and the even more generally applicable presumption of regularity, *see Parke v. Raley*, 506 U.S. 20, 30-31." *Coley*, 706 F.3d at 751.

Petitioner does not allege any of the objective indicia of constitutionally impermissible bias.  Instead, he relies upon the judge's words during *voir dire* as an example of bias.  In *Liteky v. United States*, 510 U.S. 540 (1994),[3] the Supreme Court described the showing Petitioner would have to make to succeed on his bias claim:

---

[3]*Liteky* is a case that addresses the statutory recusal standard for federal judges.  The Sixth Circuit has, nonetheless, relied on *Liteky* to provide the standard for assessing judicial bias claims under the Due Process Clause.  *See Alley v. Bell*, 307 F.3d 380, 386 (6th Cir. 2002); *Lyell v. Renico*, 470 F.3d 1177, 1187 (6th Cir. 2006).

First, judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. *See United States v. Grinnell Corp.*, 384 U.S., at 583. In and of themselves (i.e., apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required (as discussed below) when no extrajudicial source is involved. Almost invariably, they are proper grounds for appeal, not for recusal. Second, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They may do so if they reveal an opinion that derives from an extrajudicial source; and they will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible. An example of the latter (and perhaps of the former as well) is the statement that was alleged to have been made by the District Judge in *Berger v. United States*, 255 U.S. 22 (1921), a World War I espionage case against German-American defendants: "One must have a very judicial mind, indeed, not [to be] prejudiced against the German Americans" because their "hearts are reeking with disloyalty." *Id.*, at 28 (internal quotation marks omitted). Not establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.

*Liteky*, 510 U.S. at 555-56. That is the clearly established federal law against which the Michigan Court of Appeals determination must be measured.

The Michigan Court of Appeals rejected Petitioner's claim of judicial bias employing a standard virtually identical to the *Liteky* standard:

Defendant has the right to a fair and impartial trial under both the United States and Michigan Constitutions. See US Const, Am VI; Const 1963, art 1, § 20. This right is violated when the trial court's conduct "pierces the veil of judicial impartiality." *People v Conley*, 270 Mich App 301, 307-308; 715 NW2d 377 (2006). Although "a trial judge has wide discretion and power in matters of trial conduct," a trial court pierces the veil of judicial impartiality when its conduct or comments are "of such a nature as to unduly influence the jury and thereby deprive the appellant of his right to a fair and impartial trial." *People v Jackson*, 292 Mich App 583, 598; 808 NW2d 541 (2011) (citations and quotation marks omitted).

"A defendant claiming judicial bias must overcome a heavy presumption of judicial impartiality." *Id*. (citation and quotation marks omitted). A judge's opinions or

judicial rulings are not valid grounds for alleging bias "unless there is a deep-seated favoritism or antagonism such that the exercise of fair judgment is impossible." *Id.*, quoting *People v Wells*, 238 Mich App 383, 391; 605 NW2d 374 (1999) (quotation marks omitted); see also *Armstrong  v  Twp of Ypsilanti*, 248 Mich App 573, 596; 640 NW2d 321 (2001).  In addition, "[c]omments that are critical of or hostile to counsel and the parties are generally not sufficient to pierce the veil of impartiality." *Jackson*, 292 Mich App at 598.

A trial court should, to the extent practical, make its rulings outside the presence of the jury.  MRE 103(c).  But here, the trial court had already made a ruling excusing the prospective jurors and defense counsel did not object until some had already left.  It is unclear from the record how many, if any, prospective jurors heard counsel's objection first-hand.  In any event, the trial court logically explained defense counsel's objection  to the prospective jurors when she called them all back to the courtroom and changed her ruling.  Nothing in the trial court's ruling evidences deep-seated favoritism or antagonism toward either defense counsel or J. Brown.  Cf.  *Wells*, 238 Mich App at 391 (even calling a defendant's attorney a liar, while punishing the attorney, did not indicate a bias or prejudice against the defendant).  Rather, the trial court merely chronicled what had happened as a means of explanation.  Therefore, J. Brown cannot overcome the heavy presumption of judicial impartiality.  See *Jackson*, 292 Mich App at 598.

(Mich. Ct. App. Op., ECF No. 9-30, PageID.3727-3728.)  The state appellate court's application of the standard was eminently reasonable and well-supported by the record.  There is nothing in the trial court's words during *voir dire* that suggests any antagonism towards Petitioner or his counsel.  As the court of appeals recognized, the trial judge did nothing more than explain to the jurors what had happened.  It is certainly possible that the trial judge could have handled the recalling of the jurors in a way that would have not identified the source of the objection; but that does not mean that the way the judge handled the matter evidenced bias.

The state appellate court took the analysis one step further.  The court concluded that, if there were any error in the court's handling of the matter, it was harmless:

Even if we were to conclude that the trial court's statement amounted to error, it was harmless beyond a reasonable doubt.  See *People v Anderson*, 446 Mich 392, 405; 521 NW2d 538 (1994).  Before and after the evidence was presented, the trial court instructed the jury to ignore any opinions it believed the trial court possessed about the case, and to "set aside any bias or prejudice."  "Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors." *People  v  Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003).  In addition,

defense counsel had an opportunity to explain his objection on the record, in the presence of all the prospective jurors that heard the trial court's statement.  As a result, the jury learned that his objection was not made out of disrespect for anyone's religious beliefs, but instead was intended to ensure that defendants had a jury that was representative of the cross-section of the local community, including Muslim citizens.  Nothing in the record demonstrates that J. Brown suffered any prejudice from counsel's objection or the trial court's comments.  On the contrary, even one prospective juror, who was initially upset that she could not celebrate the holiday, testified that she could be fair and would not hold grudges against defendants for this situation.  Again, J. Brown cannot overcome the heavy presumption of judicial impartiality and even if the trial court erred, any error was harmless beyond a reasonable doubt.

(Mich. Ct. App. Op., ECF No. 9-30, PageID.3728.)

On habeas review, a court must assess harmlessness under the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993).  *See Fry v. Pliler*, 551 U.S. 112, 120-21 (2007).  The *Brecht* standard requires the Court to consider whether the constitutional error in the state criminal trial had a "substantial and injurious effect" on the result.  *Brecht*, 507 U.S. at 638.  The standard applied by the Michigan Court of Appeals was different, but still consistent with clearly established federal law.  The "harmless beyond a reasonable doubt" standard applied by the state appellate court is taken from *Chapman v. California*, 386 U.S. 18 (1967); it is the standard appropriate for harmlessness analysis on direct review.  *Fry*, 551 U.S. at 116.

"When a *Chapman* decision is reviewed under AEDPA, 'a federal court may not award habeas relief under § 2254 unless the *harmlessness determination itself* was unreasonable.'" *Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015) (quoting Fry, 551 U.S. at 119).  Therefore, to overcome the state court's harmlessness determination, Petitioner "must show that the state court's decision to reject his claim 'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement.'"  *Davis*, 135 S. Ct. at 2199 (quoting *Harrington*, 562 U.S. at 103).  Petitioner does not come close to satisfying that standard.

The Michigan Court of Appeals' determinations that Petitioner failed to establish a due process violation resulting from judicial bias—and that any possible error was harmless—are neither contrary to, nor unreasonable applications of, clearly established federal law.  Accordingly, Petitioner is not entitled to habeas relief on his judicial bias claim.

VI.    Admissibility of the Phone Records

Petitioner next complains that the prosecutor produced only nominal evidence linking the critical cell phone number to Petitioner.  (Pet'r's Br. on Appeal, ECF No. 9-30, PageID.3785.)  Petitioner argues:

> [T]he People failed to meet the foundational requirements for admission of any evidence concerning the phone records.  The prosecution brought forth no positive eyewitness identification of the phone [as Petitioner's] or that it was in his possession when the calls were made or received.  In the absence of such evidence, it cannot be known on this record whether in fact [Petitioner] was even aware of the messages or that he was at the locations of the phone when the calls were made.

(*Id.*, PageID.3786.)   The court of appeals agreed that physical evidence requires a proper foundation.  (Mich. Ct. App. Op., ECF No. 9-30, PageID.3729.)  It turned to Michigan Rule of Evidence 901 regarding authentication and identification, and cases interpreting the rule, to assess whether an adequate foundation for the phone evidence was laid in Petitioner's case.  (*Id.*)  The court concluded the foundation laid was adequate under Michigan Rule of Evidence 901.

The extraordinary remedy of habeas corpus lies only for a violation of the Constitution.  28 U.S.C. § 2254(a).  As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions."  *Id.* at 67-68.  Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Id.*

20

at 68.  State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.  *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  This approach accords the state courts wide latitude in ruling on evidentiary matters.  *Seymour*, 224 F.3d at 552 (6th Cir. 2000).

Further, under the AEDPA, the court may not grant relief if it would have decided the evidentiary question differently.  The court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts.  *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000).

Petitioner has not met this difficult standard.  He does not identify any Supreme Court decisions considering the same question of law or making any decision on materially indistinguishable facts.  Indeed, Petitioner's argument on this issue cites no federal authority at all.  The only link to the federal constitution and Petitioner's argument is his use of the words "due process rights to a fair trial" in his statement of the issue.  Petitioner has utterly failed to demonstrate that the Michigan Court of Appeals determinations on the admissibility of the phone records is contrary to, or an unreasonable application of, clearly established federal law.  Accordingly, he is not entitled to habeas relief.

## Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted.  A certificate should issue if Petitioner has demonstrated a

"substantial showing of a denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability.  *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001).  Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* at 467.  Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000).  *Murphy*, 263 F.3d at 467.  Consequently, I have examined each of Petitioner's claims under the *Slack* standard.  Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Id.*  "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims.  *Id.*

I find that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims would be debatable or wrong.  Therefore, I recommend that the Court deny Petitioner a certificate of appealability.

## **Recommended Disposition**

For the foregoing reasons, I recommend that the habeas corpus petition be denied. I further recommend that a certificate of appealability be denied.

Dated:  January 29, 2018                    /s/ Ray Kent
                                            United States Magistrate Judge

## <u>NOTICE TO PARTIES</u>

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).